DAVIS *et al.* v. SCOVERN *et al., Appellants.*

130  303|
f155 137|

### Division One, November 7, 1895.

1. **Parol Evidence**: WRITTEN CONTRACT. The parties to a written contract may by oral agreement made after its execution change or alter its provisions and such change may be shown by parol evidence.

2. ———: ———. So, where the instrument on its face shows that all its provisions are not included therein, the omitted parts may be shown by parol evidence.

3. ———: ———. Where, however, the instrument is complete within itself, oral testimony is not competent to add to or to vary or modify the contract by showing the existence of an agreement not expressed in the writing.

4. **Execution Sale**: PURCHASER: TRUST. A trust relation between the purchaser at an execution sale and the execution debtors can not be established by proof of mere loose or disconnected statements of the parties, and this is specially true where it is attempted by such evidence to supersede a special written agreement.

5. ———: ———: ———. A purchaser of land at an execution sale will not, in the absence of a contract to that effect, be deemed to have bought in trust for the former owners, nor is this affected by proof that the latter afterward paid the amount of the purchase price at the execution sale to the purchaser on his making a quitclaim deed for a part of the premises.

*Appeal from Cole Circuit Court.*—HON. D. W. SHACKLEFORD, Judge.

REVERSED AND REMANDED.

*Silver & Brown* for appellants.

(1) The finding of the trial court is in direct conflict with the evidence. It conclusively shows that a written contract was entered into between S. W. Scovern and Abraham Fulkerson, Sr., as to the purchase of the land at the tax sale, and that Scovern in

his lifetime fully complied with the terms of said written contract, and such being the case, plaintiffs are entitled to no relief in the premises. A written contract succeeds to a prior verbal one in reference to the same matter. *Hager v. Hager*, 71 Mo. 610; *Pearson v. Carson*, 69 Mo. 550; *Chrisman v. Hodges*, 75 Mo. 413; *State, etc., v. Hoshaw*, 98 Mo. 358; *Morgan v. Porter*, 103 Mo. 135; *Plumb v. Cooper*, 121 Mo. 668. (2) Even conceding respondents' theory is correct, viz., that they can prevail if they establish the alleged trust contract by parol evidence, still the evidence in this case is altogether insufficient to support a finding on that theory. *Kennedy v. Kennedy*, 57 Mo. 73; *Gillespie v. Stone*, 70 Mo. 505; *Burdett v. May*, 100 Mo. 13; *Taylor v. Von Schraeder*, 107 Mo. 206; *King v. Isley*, 116 Mo. 155; *McFarland v. Laforce*, 119 Mo. 585. The case of *Taylor v. Von Schraeder* and *Gillespie v. Stone*, *supra*, arose under alleged agreements on part of purchasers at execution or trustee's sale to reconvey to former owners, and hence are directly applicable here. (3) The validity of the tax sale and deed thereunder to Scovern is not assailed; in fact, their validity is conceded by the the petition. Such being the case, there is no foundation for the finding of the court, that said sale was affected by the fact that by-standers and others did not bid at said sale, because of the alleged agreement that Scovern was buying for Fulkerson's children. *First.* There is nothing in the record showing the value of the property sold at the execution sale, and this is material in a case of the present character. *Gillespie v. Stone*, 70 Mo. 505. *Second.* The finding of fact here complained of, viz., as to suppression of bidding at the sale, is a departure from the petition, which in no way assails the validity of that transaction, and such finding is also unsupported by the evidence. See case last cited. *Third.* The statute of limitations has long since

Davis v. Scovern.

run against any infirmity in the execution sale. The doctrine of laches is also an insuperable barrier to any objection to such sale. (4) Respondents' claim is barred by laches. *McNew v. Booth,* 42 Mo. 189; *Gillespie v. Stone,* 70 Mo. 505; *Burdett v. May,* 100 Mo. 13; *Wendover v. Baker,* 121 Mo. 273. The action to redeem must have been brought within a reasonable time. Authorities *supra.* (5) This being an equity case, it is substantially triable *de novo* in the supreme court. *Blount v. Spratt,* 113 Mo. 48, and cases cited.

*W. S. Pope* and *J. R. Edwards* for respondents.

(1) The petition alleges facts sufficient to constitute a cause of action and sustain the finding of the court. *Gillespie v. Stone,* 70 Mo. 505; *Turner v. Johnson,* 95 Mo. 431; *O'Fallen v. Clopton,* 89 Mo. Rep. 284. (2) No principle of law is better settled than that parties may by oral agreement made after the execution of a written contract alter the written contract, or abrogate it altogether. *Bunce v. Beck,* 43 Mo. 266; *Brown v. Bowen,* 90 Mo. 184; *Plumb v. Cooper,* 121 Mo. 668. (3) The evidence in this case clearly shows that Mr. Scovern had been fully repaid all that Mr. Fulkerson owed him, and, this being true, granting for the time that the written contract was the only one between them in equity and good conscience, his heirs should reconvey this property to the children who were the owners of it. Pope says: "Mr. Scovern told me that Fulkerson had finally settled with him for all he owed him." (4) The plea of the statute of limitations is not well taken. *Miller v. Bledsoe,* 61 Mo. 96; *Bradley v. Railroad,* 91 Mo. 493.

ROBINSON, J.—This is a suit in equity wherein plaintiffs seek to have defendants declared trustee of

certain property therein described, held by them, for the use and benefit of plaintiffs, with a prayer that title be divested out of defendants and invested in and decreed now the property of plaintiffs, based upon the following petition filed March 2, 1892:

"The plaintiffs state that their mother, Flora A. Fulkerson, departed this life intestate on the fifth day of May, 1859, in Cole county, Missouri, owning all of in-lots in the city of Jefferson, in said county and state, numbered and known on the plat and plan thereof as in-lots eleven (11) and twelve (12). That she left surviving her a husband, Abraham Fulkerson, Sr., and the following named children: Frank G. Fulkerson, Hester S. Fulkerson, Abraham Fulkerson, Jr., James L. Fulkerson, Charles B. Fulkerson, John F. Fulkerson, to whom said real estate descended.

"That upon the death of said Flora A. Fulkerson the said husband, Abraham Fulkerson, Sr., became and was a tenant by curtesy, and was entitled to the use, occupancy and enjoyment of said real estate for and during his natural life; that the same descended to her children in equal parts, subject to said curtesy; that Hester S. Fulkerson, one of the children, intermarried with the plaintiff, A. J. Davis; that on the twenty-ninth day of May, 1890, and a long time prior thereto, and ever since then, the said Hester S. Davis was and is insane, and is now and for many years has been confined in the insane asylum at Fulton, Missouri, as a patient therein; that her husband and natural guardian, A. J. Davis, has been duly appointed the curator of her estate, and has qualified according to law, and brings this suit for her use and benefit, and, as her husband, joins her therein.

"That on the twenty-ninth day of May, 1880, there was rendered in the circuit court of Cole county, Missouri, a special judgment against Abraham Fulker-

son, Jr., Frank Fulkerson, Hester S. Davis and A. J. Davis, her husband, James L. and John F. Fulkerson, A. J. Davis and W. S. Pope, the said Pope having acquired the said curtesy interest of the said Abraham Fulkerson, Sr. (for the sum of $486 and costs taxed at $74.02), for taxes in favor of G. H. Dulle, collector of the revenue of Cole county, Missouri, and said amounts adjudged and declared a special lien upon and against said real estate.

"That at or about the time of the rendition of said judgment, the said Abraham Fulkerson, Sr., contracted and agreed with one Samuel W. Scovern, now deceased, that he, the said Scovern, would buy the said real estate, when sold at execution sale on said judgment, and hold the same in trust for the owners thereof, until they could repay him, and as surety for the money he might advance and pay out in and about the purchase of said lands and the interest thereon, and some other small amounts of money then owing by the said Fulkerson to the said Scovern, and that when he was repaid the said several amounts so then agreed upon, he would reconvey the lands to them; that afterward, on November 5, 1880, an execution issued upon said judgment, and in accordance with said contract so made between the said Abraham Fulkerson, Sr., and S. W. Scovern, the said Scovern did, on the ninth day of December, 1880, purchase said lands at sheriff's sale for the sum of $125, which sum and all the expenses incident to said sale were paid by the said Scovern, and he received a deed from the sheriff conveying said lands to him, and went into possession thereof; that during the lifetime of said Samuel W. Scovern, the said Abraham Fulkerson, Sr., paid to the said Scovern all of said money so bid, and paid all expenses incident to the sale and purchase, and all interest thereon, and all other sums of money

he had agreed to pay for the redemption of said land aforesaid, and these plaintiffs thereupon became entitled to and ought to have conveyed to them *one half* interest in said land, subject to the curtesy of the said Abraham Fulkerson, which was acquired by the said Scovern.

"That afterward the said Scovern died intestate without having executed the said deed of conveyance to them; that the said Scovern left surviving him as his only heirs a widow, Pauline Scovern (who has since intermarried with the defendant, P. Frank Wood) and a daughter, Amelia Scovern, who is now more than 18 years of age, and the following children: Charles Scovern, Nellie Scovern, Louis Scovern; that all of said defendants are nonresidents of this state, so that the ordinary process of law can not be served upon them; that they, and each of them, have failed to make to the plaintiffs any conveyance of the property hereinbefore set out to which the plaintiffs are entitled; wherefore they pray the court to declare the said defendants the trustees of the plaintiffs holding the same, for their sole use and benefit, and that the defendants be divested of all title in and to the undivided one half of said in-lots 11 and 12, subject to the curtesy of the said Abraham Fulkerson, Sr., and that the same be invested in and decreed to the plaintiffs, and for all other proper relief."

Defendants in their answer admit the allegations of the petition in regard to the nonresidence of the defendants; that Pauline Wood was the wife of S. W. Scovern deceased, and was, at the institution of this suit, wife of P. F. Wood, and that Amelia, Charles, Nellie and Louis Scovern are the children and sole heirs of the said deceased Scovern. Further, it is admitted that Flora Fulkerson was in her lifetime the wife of Abraham Fulkerson, Sr.; that she died on

May 5, 1859, owning all of in-lots 11 and 12, in the said city of Jefferson; that she left surviving her Abraham Fulkerson, her husband, her children: Frank G., Hester S., Abram, Jr., James L., Charles B., and John F. Fulkerson as stated in the petition; that this property descended to her children subject to her husband's curtesy; that Hester S. Fulkerson, now Davis, is insane and her husband is her duly appointed guardian, as stated in the petition; further admits the rendition of the judgment by the circuit court of Cole county as charged in the petition in favor of Dulle, collector of Cole county, declaring it a lien on the said lots 11 and 12; that, under an execution duly issued under said judgment, they were sold to S. W. Scovern by the sheriff of Cole county aforesaid, and that a deed was executed to him and duly recorded in the recorder's office of Cole county.

And, further answering, set up in substance the following: That it was not true that said S. W. Scovern and Abraham Fulkerson agreed that Scovern should buy the land at the execution sale and hold the same in trust for the former owners until they could pay for for him the purchase money and interest, and other sums due from said Fulkerson to Scovern, and that on said payment said Scovern would convey to said former owners. Defendants, however, say that a contract was entered into between said Scovern and Fulkerson as to said sale, that the same was in writing, and was to the following effect:

That said Scovern should bid at said sale as high as the sum of $100 on said in-lots 11 and 12, and if the lots should at said sale be struck off to said Scovern at any sum up to $100, then Scovern was to execute to said Abraham Fulkerson a quitclaim deed to all that part of said lots lying east of a line dividing the brick house from the rock house thereon, running back from

Main street the full depth of said lots, and that said Abraham Fulkerson, together with his sons, Jas. L. and Jno. F. Fulkerson, should quitclaim to Scovern all that part of said lots lying west of said line, and were to put said Scovern in quiet and full possession of said west part of said premises. And it was further agreed in said contract that, if necessary, Scovern was to bid $140 for the whole of said property, and was to hold all of it under his deed of purchase until Fulkerson would refund and pay any sum over and above $100 he might pay for said lots; that said surplus over $100, if any there was, should be paid to said Scovern within sixty days after the sale, and, if not so paid, then Scovern was, under said contract, to hold said property absolutely as his own.

That in accordance with said agreement Scovern purchased said land for $125 and received the sheriff's deed therefor. That on February 17, 1881, Scovern and wife (by direction of said Abraham Fulkerson) conveyed to Frank G. Fulkerson the east part of said premises (comprising the brick house), as provided in said agreement, and said Scovern thereby completely satisfied the requirements of said contract.

Defendants further interposed the defense of the statute of limitations as to the west part of said premises, and as to which they have been in possession for more than ten years before the institution of the present suit, and also pleaded plaintiffs' laches in bringing suit.

Plaintiff's reply was a general denial of the new matter.

Upon the trial of the facts on the issues as thus made up, the court below made its finding and rendered judgment for the plaintiffs, granting to them the relief asked in the petition, decreeing that defendants be

divested of title to an undivided one half of said lots and that the same be fully invested in the plaintiffs.

After timely motions for new trial and in arrest of judgment had been overruled, defendants appealed to this court, assigning as their chief reasons the action of the court in admitting oral testimony to be introduced by plaintiff of an alleged oral contract between S. W. Scovern and Abraham Fulkerson after it appeared that a contract regarding the sale and purchase of the lots in controversy, in writing and duly executed by the parties and acknowledged by plaintiff witness had been shown, and, secondly, because plaintiff's alleged right of action was barred by laches and the statute of limitations.

As the contract, affecting the sale and purchase of this property, pleaded by defendant was admitted to be genuine by the plaintiff, and to have been executed by the said S. W. Scovern and Abraham Fulkerson, and contained the provisions as pleaded by defendants; and, as the proof was unquestioned that its provisions had been carried out by the parties thereto according to its letter and spirit, except as it was modified at the instance of Fulkerson by having the deed referred to in the contract made to his son Frank instead of himself, plaintiffs' objections thereto being based solely on the grounds that they were not bound by it, we have thought best to give in full the testimony of the witness Pope, by whom alone plaintiffs seek to establish the trust contract that they now ask the court to enforce for them, together with the testimony of Mr. Ott, the deputy sheriff, who conducted the execution sale of the property in 1880, as to a statement he heard made while the execution sale of this property was in progress.

The witness W. S. Pope, testifying for plaintiffs,

says: "I know the parties to this suit. I knew S. W. Scovern and Abraham Fulkerson in their lifetime.

"*Question by Mr. Silver, attorney for defendants:* Do you know, Mr. Pope, that there was an agreement in writing. *A.* I have seen a writing since this suit was commenced.

"*Q.* (Showing witness paper.) Is this the writing you have seen? *A.* Yes, sir; I think you showed it to me.

"*Q.* Signed by whom? *A.* Signed by Scovern and Fulkerson.

"*Q.* (*By J. R. Edwards, attorney for plaintiff.*) Do you know anything about another agreement made by these parties that was not written? *A.* When the land was about to sell for taxes, I brought the suit myself, and also brought a partition suit; before there was a judgment in partition. (Here attorney for defendants interposed the objection that as there was a contract in writing it should control). Objection overruled by court, and witness continued: Mr. Fulkerson desired to keep the land from being sacrificed. Abraham Fulkerson, the father of these plaintiffs, owed Mr. Scovern some money, and he and Mr. Scovern had some agreement; there was an agreement between Mr. Fulkerson and Mr. Scovern that Mr. Scovern was to buy this land at the tax sale and he was to hold it for him and his children, or some of his children. I was present at a part of the conversation. The agreement was not reduced to writing.

"*Q.* Was there any agreement other than a mere conversation? *A.* It was a conversation and an agreement as I understood it. Mr. Scovern was to buy the land and take the deed in his name to it, as I understood it, and he was to have the profits of this property until such time as Mr. Fulkerson and his boys would be able to reimburse him for this land, and also paid

some other money; paid Mr. Scovern some other money that he owed him, and he was to reimburse Mr. Scovern, and Mr. Scovern was to reconvey this land to Mr. Fulkerson and his children.

"*Q.* This property? *A.* Yes, sir; this property. I was present at the sale. This conversation and dealing between Mr. Scovern and Mr. Fulkerson lasted up to the time of the sale and at the sale Mr. Scovern bought the land, at that time explaining that he had to pay more than he expected to for the land; he finally bid the land off at the sale and what else was done after that I don't know. I suppose I must have talked with them five or six times; spoke of it (here counsel for defendant interrupted witness with an objection); Mr. Scovern told me afterward that Mr. Fulkerson had himself settled with him for all that he owed him.

"*Q.* According to the agreement? *A.* Yes, sir; I understood according to the agreement; I didn't think they signed any agreement till Mr. Silver showed it to me; I see that it is Mr. Ed. King's handwriting.

"*Q.* Did he receive a deed for the property? *A.* I think he did.

"*Q.* Did he go into possession? *A.* Yes, sir; he took possession of the property and rented it out and collected the rent, and exercised rights of ownership, and after he had told me—he told me afterward, a good while afterward—that Mr. Fulkerson had settled with him; Mr. Scovern told me that Mr. Fulkerson had settled with him."

Cross-examined by Mr. Silver:

"*Q.* How long before the sale did the conversation begin with reference to this occurrence? *A.* Between Mr. Fulkerson and Mr. Scovern?

"*Q.* Yes, sir. *A.* The conversation that I particularly refer to was a short time before.

"*Q.* The sale was December 9, 1880, you say? *A.* I can't say; it might have been five days and might have been ten days they were negotiating about it.

"*Q.* Might have been ten and might have been five days before? *A.* Mr. Fulkerson seemed very anxious to negotiate with him to buy that property for him; to preserve the property for him and his family; it might have been five days and it might have been ten days; Mr. Fulkerson and Mr. Scovern.

"*Q.* You say that you never heard of a written contract till I showed it to you? *A.* No, sir; I don't remember that I did.

"*Q.* You merely now testify as to your recollection of the conversation between these parties? *A.* Yes, sir.

"*Q.* (*By Mr. Edwards.*) You brought this suit? *A.* Yes, sir; I brought this suit. I stated that I was the tax attorney, but I didn't have anything to do with the settlement."

Philipp Ott, being duly sworn on behalf of the plaintiffs, testified as follows:

"*A.* Well, at the time the sale was going on Mr. Fulkerson was there and Mr. Scovern was there, and, of course, many others were there; and while the property was going at a very low rate, Mr. Scovern and Mr. Fulkerson—Mr. Fulkerson said it was not worth while to bid; that Mr. Scovern was buying this for him, and Mr. Scovern said that—Mr. Scovern said that he was buying this property for Mr. Fulkerson; and Mr. Fulkerson was there, and, of course, that fact kept other people from bidding on it then; it was not worth while to bid against them.

"*Q.* The bids were knocked off, then; knocked off to Scovern? *A.* Yes, sir."

As stated above, there was little or no conflict in the testimony as given by the witnesses, the merits of

the controversy depending upon the question as to the admissibility of the testimony as offered, and its effect when considered in the light of all the facts shown.

While it is true, as contended by respondents, that parties may, by oral agreements made after the execution of a written contract, change, alter, or abridge it altogether, or where the instrument on its face shows that all its terms are not included in the writing, those terms and provisions may be proven by parol, it is equally as well recognized and established a principle of evidence that where the instrument embodying the contract between two or more contracting parties is complete in itself, it is never permitted by oral testimony to add to, vary, or modify the instrument by showing the existence of an agreement not expressed in the writing. To permit such a practice would effectually overthrow that salutary rule that prohibits the varying of written instruments by oral testimony of what this or that witness might think was said or done at the making of the written contract, drawn for the express purpose of preventing just such an occurrence in the future as that practice would tolerate. Here plaintiffs seek to establish a trust in favor of themselves by a few loose and unconnected statements made here and there by S. W. Scovern to Abraham Fulkerson in conversations regarding the sale and purchase of land, about which they had already made a complete contract in writing, which afterward was carried out in its letter and spirit, as shown by the letters that passed between the parties within sixty days of the sale and purchase of the lots.

While resort might be had to parol testimony to establish a trust in favor of these plaintiffs, if a trust contract in their favor had in fact been entered into after the contract read in evidence by defendants had been executed, still, as the contract read in evidence

and relied upon by defendants affected the identical lands sought to be impressed with the trust, and was signed by the parties to the alleged trust contract, there must be testimony, cogent and strong, to indicate a renouncing on the part of the contracting parties of the binding force of the written contract theretofore signed, and the substitution of the parol trust contract instead and in lieu thereof; and if the conversations had between S. W. Scovern and Abraham Fulkerson regarding the lots in controversy can be considered as referable to the contract introduced by defendants made and previously reduced to writing and harmonized with it, it should be done rather than construe it as an independent contract, annulling and setting aside or modifying its terms and conditions. All that was said by S. W. Scovern to Abraham Fulkerson in the hearing of the witness Pope or Ott, the only witnesses who testified at all as to the contract or statement made and relied upon by plaintiffs to establish the trust in their favor could be said with the written contract in mind, without in any way substantially impeaching it.

While the conversation between Scovern and Fulkerson, as detailed by the witness Pope, might be treated as a contract sufficient to have imposed upon Scovern the obligation to have reconveyed to Fulkerson or his heirs the lots in controversy, had no other more formal contract been disclosed and this proceeding been timely instituted, after the purchase price of the lots and all obligations between Scovern and Fulkerson had been adjusted and settled, as contemplated by the terms of the conversation or agreement, still, at this day, twelve years or more after the sale and purchase of the lots, and after Scovern and Fulkerson had each said that Scovern had been settled with in full for all sums due and owing to him, and twelve years and over after the lots had been divided and deeds passed between

Scovern and Fulkerson partitioning the property in accordance with the provisions of the written contract, confessedly made and reduced to writing and signed by Scovern and Abraham Fulkerson, the father of the plaintiffs herein, just a day or so before the time of the conversation heard and detailed by the witnesses Pope and Ott were said to have taken place, the agreement is not sufficiently explicit, positive, or certain to indicate or establish the fact that Scovern and Fulkerson contemplated a contract setting aside the one just a few days previously made and reduced to writing; or that Scovern was to act as trustee for Fulkerson or his heirs in the purchase of the lots in suit other than after the manner and way indicated in the contract executed and carried out within sixty days after the sale, as was provided by the written contract offered in evidence by defendants, as covering their respective agreements and undertakings at the time (except as same was modified at the instance and suggestion afterward of Mr. Fulkerson, by requesting that the deed to the west part of lot 12, in controversy, be made to his son Frank instead of to himself, as provided by the written contract shown in evidence.

If the written contract between Mr. Scovern and Fulkerson is kept in mind, all that part of the conversations between them, as related by the witness Pope, can be reconciled with it, and need not be treated as a new contract, annulling, modifying, or altering the original that had formally been reduced to writing. It is the common experience of the lawyer to hear clients talk over the manner of executing and carrying out the details of their contracts after they have been formally agreed upon, and he has been called upon to reduce those agreements to writing; and no one would think that the loose utterances of either, in these after conversations as to minor details (or, for that matter, gen-

eral execution of the contract) would be said to govern and dominate the provisions of the executed contract, unless it be first shown that there was an express intention to change, alter, or modify the provisions of the executed contract, and a substitution of the after conversation for the provisions of the old contract.

Here, according to the written contract, Scovern was to deed parts of these lots to Fulkerson as soon as Fulkerson "shall, and will, refund and pay to said Scovern" what he had paid on said lots at execution sale and a small unpaid balance then further owing by Fulkerson to Scovern, and Fulkerson was to deliver possession of the property to Scovern, and he to hold all of it for sixty days in which this contract was to be binding and obligatory, and at the end of that time or when the money was paid the property was to be divided as expressed in the writing, Scovern deeding one part to Fulkerson, and the said Fulkerson and his sons James and John were to join in the execution of a quitclaim deed to Scovern for the other part of the lots. From what Fulkerson and Scovern spoke about the intention of Scovern to buy the property in at execution sale "for Fulkerson and his children, or some of his children," as the witness Pope understood the expression, it could not fairly be said that the making of a new and independent contract regarding these lots was contemplated, or that the conversation had reference to a new and different contract to the one that had been made and reduced to writing and signed by both of the parties just a day or so before. While the written contract provides that the deed to the part of the lots that Fulkerson was to get, on reimbursing Scovern, was to be made to him alone, evidently an interest for the sons James and John was at least contemplated, as in the contract they were to join the

father in a quitclaim deed to Scovern to that part of the lots that he, Scovern, was to retain for himself.

The conversation heard between Scovern and Fulkerson as detailed by the witness Pope is totally inadequate, under the circumstances, to establish the fact that the written contract had been abandoned, or that a new and different contract with different obligations undertaken, and different burdens or trusts assumed, was contemplated.

The written contract in this case was clearly made to avoid just what has taken place twelve years after the execution and performance thereof; and this case furnished a most excellent reason for the wisdom and necessity of that long observed rule, that courts should be slow in anywise to consider mere conversations and declarations between the parties to contracts once reduced to writing, as to what is to be done or required under them, as it will tend in many instances to the substitution of a new and different agreement for the old, and one on which the minds of both parties have not met and agreed, but contracts born wholly in the wishful and treacherous mind of one of the parties, or the slippery memory of an idle bystander.

Greenleaf, in his excellent treatise on evidence, at section 275, volume 1, thus declares the doctrine: "When parties have deliberately put their engagements into writing, in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous *colloquium* between the parties, or of conversation or declarations at the time when it was completed, or afterward, as it would tend in many instances to substitute a new and different

contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected.''

The plaintiffs further contend that, as Scovern under the written contract took the title in himself absolutely to the property and retained a part of it and received of old man Fulkerson the money in full that Scovern had been required to pay for the lots, Scovern's heirs should not now be permitted to hold the property, as the father had the money—a contention in nowise true, unless the trust relation by contract be first shown, and that carries us back to the first proposition, that that relation of trust to the land assumed by Scovern can only be shown, if by parol, by proof so strong as to leave no room for doubt, and as his relation to the trust was expressed in writing, confessedly entered into between himself and Fulkerson, it must further be shown that that trust contract was abandoned and a parol contract substituted in its place and stead.

In the absence of a contract, a trust would not be inferred in favor of Fulkerson or his heirs merely from the fact of the purchase of the lots by Scovern at execution sale and the receipt by him from Fulkerson of the same sum back afterward on the making of a quit-claim to a part of the property at the instance of Fulkerson to his son Frank. Nor would it be fair to imply, in the absence of a contract, that Scovern agreed to act as trustee in the purchase of the property simply from the fact that he received from Fulkerson the full amount of his execution purchase investment under the circumstances.

The inference that Scovern, by reason of his financial situation, was speculating on the misfortunes of Fulkerson and his children who owned this land up to the time of the execution sale, would be more natural, in view of what transpired, and the long quiet of Fulkerson before his death, and of his children afterward,

had not the written contract between them been brought to light by defendant, showing, as it does, that inference an absolute verity.

Without going into a lengthy discussion as to when, to what extent, and under what circumstances, parol testimony may or may not be heard where a written contract between contending parties or their representatives is shown to have been executed, we think that in this case, from all the facts shown, the judgment was for the wrong party, and that the proof was not sufficient to show a contract between Scovern and Fulkerson in anywise changing, altering, or modifying the one introduced by defendants that had been formally reduced to writing and delivered as witnessing their respective agreements and undertaking regarding the property in controversy.

There is nothing in respondent's objection to the introduction of the written contract pleaded by defendant, made by S. W. Scovern and Abraham Fulkerson, regarding the execution sale and the purchase and disposition of the property in controversy, on the ground that these plaintiffs could not be bound thereby, not being parties thereto. Were it not for the fact that a contract had been made between Scovern and Abraham Fulkerson, the father of these plaintiffs, no obligation on the part of Scovern to deed any part of the property in controversy to anyone would have ever arisen from the purchase of this property at execution sale. Whatever trust was created was by the contract made by Scovern and Fulkerson, and no other can be inferred.

The fact that the plaintiffs had an interest in the property along with the father has nothing to do with the question as to who is to be bound by the contract made by Scovern and Fulkerson, so far as Scovern and his heirs are concerned. Scovern's interest in the property

VOL. 130 mo—21

about which he and Fulkerson were contracting and which he afterward bought, and a part of which he retained, that is now owned by his heirs, the defendants herein, came not through Abraham Fulkerson alone, but through the sheriff by virtue of an execution *sale* to satisfy a tax lien and judgment in favor of the City of Jefferson and against all this property in a case wherein Abraham Fulkerson, his children, and all parties interested in the land were duly served with process so far as the record in this case discloses, and to that extent, by operation of law, it can be said that the plaintiffs herein joined in the conveyance of this property to Scovern.

Unless the plaintiffs could show that they had a contract with Scovern, either made by themselves or their father or someone for them, for a reconveyance of this property by Scovern, this suit can not be sustained, and the written contract made by Scovern and Abraham Fulkerson was competent and proper as testimony to show what was the limit of the trust contract agreed upon in a controversy like this when plaintiffs were claiming that a trust contract had been made by the father and Scovern in behalf of themselves as well as for himself.

Judgment reversed and cause remanded, with directions that the circuit court enter judgment for defendants. BRACE, C. J., BARCLAY and MACFARLANE, JJ., concur.